Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/17/2021 08:09 AM CST

Joy R. Vanderveer, appellee and cross-appellant,
v. Steve M. Vanderveer, appellant
and cross-appellee.

___ N.W.2d ___

Filed September 24, 2021.    No. S-20-733.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Property Division: Appeal and Error.** The division of marital property is a matter initially entrusted to the trial judge, and an appellate court will not disturb the trial court's findings, absent an abuse of discretion.

5. **Divorce: Property Division.** In a dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties.

6. ____: ____. In a dissolution action, there is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

7. **Property Division.** Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.

8. **Property Division: Proof.** The burden to show that a debt is nonmarital is on the party making that assertion.

9. **Property Division: Stock.** Unvested employee stock options and stock retention shares constitute marital property when accumulated and acquired during the marriage through the joint efforts of the parties.

10. **Property Division: Stock: Proof.** To apply the time rule from *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998), it is essential that the court be presented with evidence from which it can determine whether the unvested stock options or stock retention shares were granted as compensation for past, present, or future services. The burden to present such evidence is on the party asserting the time rule is applicable.

11. **Child Support: Rules of the Supreme Court.** When calculating the amount of support to be paid under the Nebraska Child Support Guidelines, a court must consider the total monthly income of the parties.

12. ____: ____. The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes.

13. ____: ____. When determining total income under the Nebraska Child Support Guidelines, all income from all sources is to be included except for those incomes specifically excluded.

14. **Child Support: Rules of the Supreme Court: Presumptions: Proof.** When determining total income under the Nebraska Child Support Guidelines, a court should not include income that is speculative in nature and over which the party has little or no control. But when the evidence shows the party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises, and to rebut that presumption, the party must produce sufficient evidence to show that including the income would not result in a fair and equitable child support order.

15. **Divorce: Alimony.** Neb. Rev. Stat. § 42-365 (Reissue 2016) gives courts discretion, in an appropriate case, to require sufficient security to be given for the payment of alimony awards. Generally, reasonable

security for payment of alimony should be invoked in the original decree only when compelling circumstances require it.

16. **Child Custody: Appeal and Error.** Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed in part, and in part reversed and remanded with directions.

Virginia A. Albers and Dennis G. Whelan, of Slowiaczek Albers, P.C., L.L.O., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Peebles, Belmont & Line, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

After a trial, the district court for Douglas County entered a decree dissolving the marriage of Steve M. Vanderveer and Joy R. Vanderveer, dividing their marital estate, awarding alimony to Joy, and deciding issues of custody, child support, and parenting time. Steve appeals, and Joy cross-appeals. For the reasons explained below, we affirm in part, and in part reverse and remand with directions.

## I. BACKGROUND

Steve and Joy were married in 2004. The marriage produced two children, a daughter born in 2006 and a son born in 2010. The parties separated in February 2019, and Steve moved out of the marital home. In May 2019, Joy filed a complaint for dissolution in the district court for Douglas County.

The district court entered a temporary order under which the parties shared joint legal and physical custody of their minor children. The temporary order established a 2-2-2-1 parenting time schedule that accommodated Steve's work

schedule. Under the temporary plan, Joy had a total of four overnights with the children each week and Steve had three. Among other things, Steve was ordered to pay temporary child support of $1,250 per month; the monthly mortgage, taxes, insurance, and utilities on the family residence; the monthly car payment on Joy's vehicle; and "all joint credit card obligations of the parties."

## 1. Trial

Trial was held February 25, 2020. Steve and Joy were the only witnesses. We summarize their testimony only as it pertains to the issues on appeal.

### (a) Parties' Education,
### Employment, and Income

Steve has a bachelor's degree in business and has worked for Costco since he was 17 years old. Joy has a 12th grade education but did not graduate from high school. Steve and Joy got married in their early 20's, in the State of Washington. At that time, Joy worked as a barista and Steve worked as a department manager for Costco.

When Joy became pregnant with their first child, the parties agreed that she would stay home and raise the children and that Steve would focus on his career. In 2013, Steve was promoted to a general manager position with Costco and the family moved to Illinois. In 2016, the family moved to Nebraska when Steve accepted a general manager position with a Costco facility in Omaha.

At the time of trial, Joy had returned to working part time as a barista, earning $10 per hour. She testified that due to ongoing pain from a prior foot injury, it was difficult for her to stand for more than 5 hours at a time, and she generally suggested that this restricted her ability to work full time. Joy testified she was planning to obtain her GED and then pursue further education in either interior design or real estate.

At the time of trial, Steve was still working as a general manager for Costco in Omaha. His income in that position

has increased every year, and in 2019, his reported earnings from Costco were approximately $631,000. This amount included, among other things, a base salary of approximately $125,000, an annual performance-based bonus of roughly $42,000, and more than $461,000 from Steve's participation in Costco's "Restricted Stock Unit" (RSU) program.

Steve's RSU income is by far the largest portion of his annual income, and it was a central point of contention in this dissolution. The parties disputed how to classify and equitably divide the unvested RSUs granted during the marriage, and they disagreed about whether Steve's RSU income should be included as part of his total income for purposes of calculating child support. As relevant to the issues on appeal, we describe the evidence regarding RSUs in some detail.

(b) RSUs

The RSUs granted to Steve are controlled by the "Costco Wholesale Corporation Restricted Stock Unit Award Agreement" (RSU agreement) and the "Costco Wholesale Corporation Seventh Restated 2002 Stock Incentive Plan." Only the RSU agreement was offered into evidence. That agreement generally describes that RSUs are not stock shares, but, rather, "Stock Units" which represent "hypothetical shares" of Costco stock that "will be converted into shares when the Stock Units are settled after vesting." Participation in the RSU program does not create a right to future employment with Costco and does not affect the company's right to terminate or modify employment. The RSU agreement states that RSUs "shall not be sold, encumbered, pledged or otherwise disposed of, whether voluntarily or by operation of law."

Costco grants RSUs annually, usually on October 22, to those who are eligible. The RSU agreement in our record does not set out the eligibility criteria for participation in the RSU program, nor does it describe how the company determines the number of RSUs to be granted. The total number of RSUs granted annually to Steve varied year to year, but in

each of the 6 years prior to trial, Costco granted Steve at least 1,100 RSUs.

The parties agree that all of the RSUs granted to Steve were subject to a 5-year graded vesting schedule, under which 20 percent of the units vested into shares each year so long as Steve worked continuously during the year at his current position or higher. The RSU agreement contains provisions for accelerated vesting after 25 years of service and in the event of employee death. It also contains vesting provisions for employees who are terminated for other than cause.

Costco's 2019 proxy statement was also received into evidence, and it generally describes both "time-vesting" and "performance-vesting" under Costco's RSU program. It states that "RSU grants to all executive officers are performance-based, with performance-vesting over a one-year period [and] time-vesting over five years . . . ." And it states that "[v]esting of RSUs awarded to non-executive officers and employees is not performance-based." No party contends that Steve, as a general manager, was considered an executive officer of Costco.

Steve testified that every October, when a portion of his accumulated RSUs vest into shares, he has the option to either cash them in or hold them as an investment. He routinely cashes them, and he held no vested shares at the time of trial. Throughout the marriage, the parties typically relied on Steve's base salary to pay regular monthly expenses and used his annual bonus, and the annual income from cashing vested RSUs, to pay off accumulated debt.

Under the RSU agreement, the value of vested shares is determined based on the closing stock price on the date of vesting. According to Steve's investment and tax records, the gross income earned from cashing his vested RSUs in 2017 was $227,328. In 2018, it was $384,591, and in 2019, it was $461,053.

In October 2019, Costco granted Steve another 1,150 RSUs, none of which had vested by the time of trial. At the time of

trial, Steve's Costco brokerage account held a total of 5,468 unvested RSUs from grants made in the previous 5 years, with a projected value of more than $1.1 million. Steve asked the court to classify the entire 2019 grant of RSUs as nonmarital and set it off to him, reasoning that the grant was made after the parties separated and would not begin vesting until after the marriage was dissolved. Steve proposed that the unvested RSUs remaining from grants made in 2015 through 2018 be classified and divided using the "time rule" announced in *Davidson v. Davidson*.[1]

### (c) "Postseparation" Debt

The parties' spending habits were also a point of contention at trial. Joy testified, "We, as a family, spent insane amounts of money shopping and we're accustomed to a very comfortable lifestyle . . . ." During the marriage, both parties regularly used credit cards in their own names, and Joy also used credit cards issued to Steve. According to Joy, Steve handled all of their finances and, during the year, he would make minimum payments on all of the credit cards to keep them current until the RSUs vested, after which he would use that income to pay off the balance on all the cards. Joy testified that Steve helped her apply for a credit card in her name because "we were running short on money and we had to figure out how we were going to live until October when [the RSUs vested so that] we could continue living the lifestyle that we were living."

Steve generally agreed the parties' spending habits had been an issue throughout their marriage and had prompted them to file bankruptcy 8 years earlier. He testified that their debt accumulated "so frequently I can't keep up" and stated "I'm the only guy in the world [who] makes [$]630,000 and I have no money. I'm broke."

Joy testified that after the parties separated, she was "taken off" their joint checking account and used credit cards because she had no other source of income. Joy admitted that

---

[1] *Davidson v. Davidson*, 254 Neb. 656, 664, 578 N.W.2d 848, 856 (1998).

between the date of separation and the date of trial, she accumulated $73,656 in credit card debt. During this period, she used credit cards to purchase what she described as "necessities" for the family, including clothes, furniture and household goods, gas, groceries, dental and medical care, cell phones, and "[m]iscellaneous stuff" for herself and the children. Joy also testified that when Steve was setting up his apartment, she used credit cards to purchase several thousand dollars' worth of furnishings and household items for Steve and the children. Steve did not, for the most part, dispute Joy's description of the items she purchased on credit, but he did characterize her spending as excessive. When Steve was asked whether his spending habits were similar to Joy's, he responded, "Not even in the ballpark . . . ."

Steve testified that postseparation, he incurred $72,238.54 in debt using credit cards in his name, personal lines of credit, and loans against his 401K. He testified that some of this debt was incurred to meet his obligations under the temporary order, but he took the position that each party should be responsible for the postseparation debt incurred in his or her own name. Joy took the position that her postseparation credit card debt should be classified as marital.

### (d) Proceeds From Vested RSUs Sold in 2019

Steve testified that when he cashed the shares that vested in October 2019, the proceeds were $322,921.95, after taxes. He used those proceeds to pay off $191,421 in what the parties generally agree was marital debt. At the time of trial, $131,500 of the proceeds remained. Steve proposed that after using the proceeds to pay the parties' 2019 tax obligations, all remaining proceeds should be awarded to him, with an appropriate equalization payment to Joy.

### (e) Custody and Parenting Time

At the time of trial, the parties' daughter was 13 years old and their son was 9 years old. Neither parent claimed the

other was unfit, and they agreed joint legal custody was appropriate. But they disagreed on how physical custody and parenting time should be allocated.

Joy asked for sole physical custody, reasoning:

[B]efore Steve and [I] ever had children, it had been established that I would stay at home with the children and raise them, and that would enable him to further his career with Costco.

I've always been the primary caretaker in charge of doing all the school — all of their educational stuff, doctors' appointments, dentist appointments. I would still like to be able to play that role.

Joy testified she did not like the temporary parenting time schedule. She thought it required too much "back and forth," and she did not "feel like [the children were] ever able to settle at either home before they ha[d] to be taken to the next home." She also testified that Steve had missed several days of parenting time due to his work schedule, and she disapproved of some of his parenting decisions, including allowing the children to use electronics in the evening and leaving their teenage daughter to watch their preteen son.

Steve asked the court to order joint physical custody and to continue the roughly equal parenting time schedule the parties had been following under the temporary order. Steve thought it was important for the children to have regular contact with both parents, and he liked that "neither one of us ha[s] to go more than two nights without seeing our children." He testified that the children had "never expressed any concerns with the back-and-forth" and he liked the temporary parenting schedule because it accommodated his work hours and allowed him to "spend the most time with my children and still work and provide" for them.

### (f) Child Support

For purposes of calculating child support, Joy estimated her total monthly income at $1,083, based on a 25-hour

workweek earning $10 per hour. She estimated Steve's total monthly income at $52,594 based on his 2019 W-2 form, which reported "Medicare wages and tips" in the amount of $631,130. The parties agree this included Steve's 2019 salary, bonus, and vested RSU income.

Steve took the position that his RSU income should not be considered when calculating child support, reasoning that such income was not "guaranteed" in the future, because stock prices could fall or he could be demoted or terminated. Excluding his RSU income, Steve estimated his total monthly income at $13,955.83, based on his 2019 base salary of $125,000 and his 2019 bonus of $42,000. Steve believed Joy was capable of working full time and earning more than $10 per hour. He thus estimated Joy's total monthly income either at $2,080, based on a 40-hour workweek earning $12 per hour, or at $2,600, if she worked the same amount earning $15 per hour. Steve asked the court to calculate child support using the joint physical custody worksheet, based on his request for roughly equal parenting time.

### (g) Alimony

Joy requested an award of alimony, but our record does not indicate the proposed amount or duration of her request. Joy supported her request with an exhibit showing her anticipated monthly living expenses were $8,470. Most of the itemized expenses were for rent, food, utilities, and medical payments, but approximately $2,000 was allocated monthly for clothing, cosmetics, haircuts, entertainment, vacations, and "[m]iscellaneous" costs.

Steve generally agreed Joy should receive alimony, but he asked the court to order graduated payments, claiming that otherwise, he would not have enough to live on without incurring monthly debt. Steve estimated his monthly expenses were approximately $13,225, but that amount included several thousand dollars in payments required under the temporary order, which would not exist postdecree. Steve proposed paying alimony for a period of 5 years, with payments of $750

for the first 24 months, $1,500 for the next 24 months, and $2,000 for the final 12 months.

## 2. Dissolution Decree

On September 3, 2020, the court entered a dissolution decree. We summarize below only those provisions pertinent to the issues raised on appeal and cross-appeal.

### (a) Classification and Division of RSUs

When classifying and dividing the RSUs, the court made the following findings:

> [T]he RSUs granted . . . on October 22, 2015, October 22, 2016, October 22, 2017, and October 22, 2018, even though not yet fully vested, are marital property and when said RSUs vest [Joy] shall be awarded 50% of the actual net value after the payment of taxes. [Steve] is awarded the RSUs granted on October 22, 2019 free and clear of any interest of [Joy].

Regarding proceeds from the vested RSUs cashed in 2019, the court found that $191,421.10 had been used to pay down marital debt, including credit card debt. It directed that the remaining proceeds of $131,500.90 be used to pay the parties' 2019 state and federal taxes and to pay off Joy's post-separation credit card balance of $72,656, which the court classified as marital debt. After payment of these marital debts, the remaining proceeds of $24,583.90 were awarded equally to the parties.

### (b) Child Custody and Support

The court found that both Steve and Joy were fit and proper persons to be awarded the care, custody, and control of the children and that it was in the children's best interests for the parties to share joint legal custody, with Joy having physical custody. The decree ordered an alternating weekly parenting time schedule under which Steve had the children four consecutive overnights during the first week and two consecutive overnights during the second week. As such, Steve still had 6 out of every 14 overnights with the children, but each

parent had longer blocks of time than the temporary schedule allowed and the children had fewer transitions each week.

In calculating child support, the court generally accepted each party's estimate of his or her own total monthly income. It did not include any RSU income when determining Steve's gross income, reasoning:

> The Court finds that the [RSUs] and the income therefrom which have not vested [from units granted] on October 22, 2015, October 22, 2016, October 22, 2017, and October 22, 2018 are marital property and as such should not be used to compute the child support due and owing from [Steve] to [Joy]. . . .
>
> At such time as the [RSUs] granted on October 22, 2019 begin to vest and when any such units granted thereafter vest any RSU income realized by [Steve] shall be considered income for purposes of calculating child support.

The court's child support worksheet was attached to the decree. Using gross monthly income of $1,083 for Joy and $13,955.83 for Steve, the court calculated that Steve should pay $1,875 per month in child support for two children. After determining that a downward deviation was appropriate "due to the additional parenting time granted to [Steve]," the decree ordered Steve to pay monthly child support of $1,600 for two children and $1,100 for one child.

### (c) Alimony

The court ordered Steve to pay alimony of $4,000 per month for a period of 8 years or until the death of either party or Joy's remarriage, whichever occurred first. The decree did not require Steve to provide security for his alimony obligation.

### 3. Motions to Alter or Amend

Both parties timely moved to alter or amend the decree, seeking changes to provisions regarding parenting time, child support, alimony, classification and division of unvested RSUs, and allocation of the proceeds remaining from the

vested RSUs cashed in 2019. After a hearing, the court generally overruled the motions, but it did modify Steve's parenting time to better accommodate his work schedule. That modification resulted in each parent having the children 7 out of every 14 overnights.

Steve timely appealed, and Joy cross-appealed. We moved this appeal to our docket on our own motion, primarily to address the assignments of error pertaining to the RSUs.

## II. ASSIGNMENTS OF ERROR

Steve assigns, consolidated and restated, that the district court erred by (1) classifying Joy's postseparation credit card debts as marital, (2) failing to apply the time rule from *Davidson*[2] when classifying and dividing unvested RSUs, (3) miscalculating child support, and (4) awarding excessive alimony.

On cross-appeal, Joy assigns, restated and renumbered, that the district court erred by (1) miscalculating child support, (2) awarding insufficient alimony, (3) failing to require Steve to maintain life insurance to secure the alimony award, and (4) awarding the parties equal parenting time.

## III. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[3] This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.[4]

[2] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[5]

---

[2] *Id.*

[3] *Cornwell v. Cornwell*, 309 Neb. 156, 959 N.W.2d 243 (2021).

[4] *Id.*

[5] *Id.*

[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[6]

## IV. ANALYSIS

### 1. Classification and Division of Marital Assets and Debts

[4-6] The division of marital property is a matter initially entrusted to the trial judge, and an appellate court will not disturb the trial court's findings, absent an abuse of discretion.[7] In a dissolution action, the equitable division of property is a three-step process.[8] The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property to the party who brought the property to the marriage.[9] The second step is to value the marital assets and marital liabilities of the parties.[10] And the third step is to calculate and divide the net marital estate equitably between the parties.[11] There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.[12]

### (a) Classifying Joy's Credit Card Debt

At trial, Steve asked the court to classify all postseparation debt as nonmarital and set it off to the spouse who incurred

---

[6] *Id.*

[7] *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001).

[8] *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

[9] *Id.* See *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

[10] *Dooling, supra* note 8.

[11] *Id.*

[12] *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

it. The court's decree classified all of Joy's postseparation credit card debt as marital, and Steve argues that was an abuse of discretion. He also argues the court should have similarly classified all of his postseparation debt as marital, but since Steve expressly asked the court to set that debt off to him, he cannot now argue it was error to do so.[13] We therefore consider only his assignment that it was error to classify Joy's postseparation debt as marital.

[7,8] It is well settled in Nebraska that marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.[14] The burden to show that a debt is nonmarital is on the party making that assertion.[15]

Steve concedes that Joy's credit card debt was incurred during the marriage, but he argues it should have been classified as nonmarital debt because it was incurred after the parties separated. We understand his appellate briefing to generally urge adoption of a bright-line rule requiring that marital debt must have been incurred "'before [the] date of separation.'"[16] We decline his invitation.

In the 2004 case of *Mathews v. Mathews*,[17] we announced the general rule that "[m]arital debt includes only those obligations incurred during the marriage for the joint benefit of the parties." We have consistently applied this flexible, fact-specific standard,[18] and we see no principled reason to apply a different standard in this case. To the extent the Nebraska Court of Appeals articulated a more restrictive definition of

---

[13] See *Mahlendorf v. Mahlendorf*, 308 Neb. 202, 952 N.W.2d 923 (2021) (parties cannot complain on appeal of error they invited court to commit).

[14] *Fetherkile, supra* note 9; *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006); *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004).

[15] *Fetherkile, supra* note 9; *Millatmal, supra* note 14.

[16] Brief for appellant at 16.

[17] *Mathews, supra* note 14, 267 Neb. at 621, 676 N.W.2d at 58.

[18] See, e.g., *Fetherkile, supra* note 9; *Millatmal, supra* note 14.

marital debt in a 2002 opinion,[19] that definition was implicitly disapproved by *Mathews* and we expressly disapprove of it here.

Applying the settled definition of marital property in our de novo review, we find undisputed evidence that Joy's credit card debt was incurred during the marriage, and we also find evidence showing the items she purchased were for the joint benefit of the parties. Joy testified she used credit cards to pay family medical and dental expenses, to purchase items for Steve's apartment postseparation, and to purchase groceries, clothing, furniture, household goods, gas, cell phones, and "[m]iscellaneous stuff" for herself and the children. Steve did not specifically dispute Joy's description of the items she purchased on credit, but he did generally characterize her purchases and her spending habits as excessive.

The record shows a pattern of indulgent spending by the parties throughout their marriage, but indulgent spending and marital debt are not necessarily mutually exclusive. It was Steve's burden to show the debt was nonmarital,[20] and on this record, we cannot find an abuse of discretion in classifying Joy's postseparation credit card debt as marital. We reject Steve's first assignment of error.

### (b) Classification of Unvested RSUs and Time Rule

At the time of trial, Steve's Costco brokerage account held unvested RSUs from annual grants made in 2015, 2016, 2017, 2018, and 2019. The trial court classified all of the unvested RSUs awarded from 2015 through 2018 as marital property, and it classified the RSUs awarded in 2019 as nonmarital property. Neither party challenges the classification of the 2019

---

[19] See *McGuire v. McGuire*, 11 Neb. App. 433, 448, 652 N.W.2d 293, 305 (2002) (stating "[a] marital debt is 'one incurred during marriage and before date of separation by either spouse or both spouses for joint benefit of parties'").

[20] See, *Fetherkile, supra* note 9; *Millatmal, supra* note 14.

RSUs as nonmarital. But Steve assigns that when classifying and dividing the unvested RSUs granted to him from 2015 through 2018, the district court erred by not applying the time rule from *Davidson*.[21]

One of the issues in *Davidson* was how to classify and equitably divide unvested employee stock options and stock retention shares. When the parties in *Davidson* married, the husband was a senior executive with Union Pacific. Both before and during the marriage, a large portion of the husband's compensation was composed of employee stock options and stock retention shares. Similar to the RSUs at issue here, the stock retention shares in *Davidson* were described as "stock shares that are unvested when granted but will vest at some predetermined point in time . . . only if [the husband] remained employed with Union Pacific until a certain point in time."[22]

When the parties in *Davidson* separated after roughly 2 years of marriage, a primary dispute at trial was how to classify and value the husband's unvested stock options and unvested stock retention shares. The trial court concluded this property was "too difficult to value" and excluded it from the marital estate.[23] On appeal, we found the trial court abused its discretion by entirely excluding the unvested stock options and stock retention shares from the marital estate.

[9] Our opinion in *Davidson* considered an issue of first impression in Nebraska: How should courts determine whether unvested employee stock options and restricted stock plans are marital or nonmarital property? To answer that question, *Davidson* began with the long-settled rule that "the marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties."[24] *Davidson* also observed that Neb. Rev. Stat. § 42-366(8) (Reissue

---

[21] *Davidson, supra* note 1.

[22] *Id.* at 660, 578 N.W.2d at 853.

[23] *Id.* at 660, 578 N.W.2d at 854.

[24] *Id.* at 662, 578 N.W.2d at 854. See, also, *Dooling, supra* note 8.

2016) mandates that "court[s] shall include as part of the marital estate . . . any pension plans, retirement plans, annuities, and other deferred compensation benefits owned by either party, whether vested or not vested." After considering this authority, *Davidson* announced a new proposition of law: "[U]nvested employee stock options and stock retention shares constitute marital property when accumulated and acquired during the marriage through the joint efforts of the parties."[25]

Applying this new proposition to the evidence in *Davidson*, we first rejected the husband's argument that all of his unvested stock options and stock retention shares were the result of his sole efforts, rather than the parties' joint efforts. We explained that so long as "unvested stock options and stock retention shares were accumulated and acquired during the marriage, they were accumulated and acquired through the joint efforts of the parties."[26] The harder question in *Davidson* was how to determine when unvested stock options and retention shares were "accumulated and acquired."

In *Davidson*, some of the unvested stock options and retention shares had been awarded to the husband before the marriage, and some during the marriage. Additionally, the evidence showed that some had vested during the marriage and that others were scheduled to vest after the date of dissolution. In fashioning a general rule to determine when unvested stock options and retention shares are accumulated and acquired for purposes of determining the marital estate, we observed:

> Most courts faced with the issue of when stock options and retention stock are accumulated and acquired look to whether and to what extent the unvested employee stock options at issue were granted for past, present, or future services and then determine what percentage thereof was earned during the marriage and what percentage was

---

[25] *Davidson, supra* note 1, 254 Neb. at 662, 578 N.W.2d at 855.

[26] *Id.* at 663, 578 N.W.2d at 855.

earned prior to the marriage and/or subsequent to its dissolution.[27]

*Davidson* referred to this as a "time rule" and concluded it was consistent with Nebraska law and "generally applies"[28] to employee stock options and stock retention shares in dissolution actions. We saw no reason, on the facts in *Davidson*, to distinguish between the two forms of compensation when applying the time rule, but we acknowledged that "other jurisdictions have held that stock retention shares are accumulated and acquired in their entirety when granted."[29]

*Davidson* described application of the time rule as a two-step process. First, "it is incumbent upon the trial court to calculate whether and to what extent the options were granted as compensation for past, present, or future services."[30] Next, "the trial court should determine what percentage of each portion thereof was accumulated and acquired during the marriage."[31]

In *Davidson*, the director of compensation for Union Pacific testified that its employee stock option program was "designed to recognize and reward past performance and to create an incentive for future contribution to the organization" and that Union Pacific granted stock retention shares "to retain [the employee] through a predetermined point in time."[32] Based on that evidence, we concluded that the husband's employee stock options were intended to compensate him "equally for both past and future services" and that the stock retention shares "were granted entirely for future services."[33]

---

[27] *Id.* at 664, 578 N.W.2d at 856.

[28] *Id.*

[29] *Id.*, citing *In re Marriage of Miller*, 915 P.2d 1314 (Colo. 1996) (en banc) (applying time rule to unvested stock options but holding unvested retention shares were marital property on date they were granted even though husband must remain employed to realize full vesting).

[30] *Davidson, supra* note 1, 254 Neb. at 665, 578 N.W.2d at 856.

[31] *Id.*

[32] *Id.* at 660, 578 N.W.2d at 854.

[33] *Id.* at 665, 578 N.W.2d at 856.

Guided by those findings, *Davidson* then proceeded to determine what percentage of each was accumulated and acquired during the marriage. To do so, we described several different formulas to apply, depending on the specific factual scenario. The general purpose of each formula is to identify and exclude from the marital estate "that portion [of unvested stock options and retention shares] which represented compensation for services performed prior to the marriage or subsequent to the dissolution."[34] Among others, *Davidson* described the following factual scenarios:

> If the option or retention share is granted during the marriage and vests during the marriage, that portion of the option or retention share which represents compensation for future services, if any, was accumulated and acquired entirely during the marriage. If, however, the option or retention share is granted during the marriage and will vest sometime after dissolution, the percentage of future services, if any, is determined by a fraction. The numerator is the period of time from the date of the grant until dissolution, and the denominator is the period of time from the date of the grant until the employee stock option vests.[35]

Steve argues the district court erred by not applying this formula from *Davidson* to determine which portion of his unvested RSUs were marital. On this record, we disagree.

Steve's argument assumes the RSUs he was granted by Costco were intended as compensation for future services. But unlike the husband in *Davidson*, Steve adduced no evidence to support any judicial determination of whether his unvested RSUs were granted as compensation for past, present, or future services. On this record, Costco's reasons for granting the RSUs to Steve remain a mystery.

---

[34] *Id.* at 664, 578 N.W.2d at 855.

[35] *Id.* at 667, 578 N.W.2d at 857.

Steve offered no testimony from his employer on this key issue, and although he offered the RSU agreement, that document does not set out the eligibility criteria for participation in the RSU program, nor does it describe how Costco determines the number of RSUs to be granted, or whether it intends RSUs to compensate employees for past, present, or future services. Costco's 2019 proxy statement summarized the company's criteria and rationale for awarding performance-based RSUs to its executive officers, but it did not specifically address the criteria or rationale for granting RSUs to nonexecutive employees like Steve. Indeed, to the extent Costco's proxy statement addressed any of the criteria governing RSUs granted to nonexecutive employees, it stated that vesting was not performance based at all.

[10] To apply the *Davidson* time rule, it is essential that the court be presented with evidence from which it can determine whether the unvested stock options or stock retention shares were granted as compensation for past, present, or future services. As such, if Steve wanted to rely on the time rule to argue that some or all of his unvested RSUs were nonmarital, it was his burden to prove, by a preponderance of the evidence, that at least some portion of the RSUs granted during the marriage were granted as compensation for future services.[36] He failed to meet that burden.

Absent sufficient evidence on which to make the factual determinations necessary to apply the *Davidson* time rule, we cannot find an abuse of discretion in the court's decision not to apply the rule. This assignment of error has no merit.

## 2. Child Support

Steve's appeal and Joy's cross-appeal both assign error to the district court's child support calculation. Steve argues

---

[36] See *id.* (stating any "option/retention share or portion thereof which is granted during the marriage and determined to be compensation for present services is accumulated and acquired in its entirety when granted").

the court should have used worksheet 3 of the Nebraska Child Support Guidelines (Guidelines), rather than worksheet 1 of the Guidelines, to calculate child support, because the parenting plan effectively established a joint physical custody arrangement.[37] Alternatively, Steve argues that when calculating the downward deviation based on Steve's additional parenting time, the court made a mathematical error.

In her cross-appeal, Joy argues the court erred by excluding all of Steve's RSU income when determining his total monthly income for purposes of calculating child support. We address Joy's assigned error first and find it has merit.

[11] When calculating the amount of support to be paid under the Guidelines, a court must consider the total monthly income of the parties.[38] The Guidelines define "[t]otal monthly income" as

> the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. All income should be annualized and divided by 12.[39]

[12-14] The main principle behind the Guidelines is to recognize the equal duty of both parents to contribute to the

---

[37] See, e.g., *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 948, 932 N.W.2d 692, 704 (2019) ("[w]here a parenting plan effectively establishes a joint physical custody arrangement, courts will so construe it, regardless of how prior decrees or court orders have characterized the arrangement"). See, also, *Elsome v. Elsome*, 257 Neb. 889, 900, 601 N.W.2d 537, 545 (1999) (directing courts to use worksheet 3 when joint physical custody is ordered, unless a "sound reason not to do so is established by the record").

[38] *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

[39] Neb. Ct. R. § 4-204 (rev. 2020).

support of their children in proportion to their respective net incomes.[40] We have been very clear that when determining total income under the Guidelines, "'all income from all sources is to be included except for those incomes specifically excluded.'"[41] A party's total monthly income "should not be based on income that is 'speculative in nature and over which the employee has little or no control.'"[42] But when the evidence shows the party "earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the Guidelines."[43] To rebut that presumption, the party must produce sufficient evidence to show that application of the Guidelines would not result in a fair and equitable child support order.[44]

The undisputed evidence shows that Steve regularly receives annual grants of RSUs from his employer, and there was no evidence this pattern is likely to change in the future. Each year, Steve cashes the RSUs that vest into shares of Costco stock, and as a result, he receives significant income above and beyond his base salary and annual bonus. The evidence shows that in 2017, 2018, and 2019, Steve's reported RSU income was approximately $227,328, $384,591, and $461,053, respectively. As such, over the 3-year period immediately before trial, Steve's actual RSU income averaged well over $357,000 annually.

Because Steve regularly earns significant RSU income and can reasonably be expected to earn it in the future, there is

---

[40] *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018).

[41] *Id.* at 108, 917 N.W.2d at 474.

[42] *Noonan v. Noonan*, 261 Neb. 552, 560, 624 N.W.2d 314, 322 (2001), quoting *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991).

[43] *Noonan, supra* note 42, 261 Neb. at 561, 624 N.W.2d at 322-23. See, also, Neb. Ct. R. § 4-203 (rev. 2020) ("[t]he child support guidelines shall be applied as a rebuttable presumption").

[44] See *Noonan, supra* note 42.

a rebuttable presumption that some amount of RSU income should have been included when computing his total income under the Guidelines.[45] And on this record, we do not see sufficient evidence to rebut that presumption.

The trial court excluded all of Steve's RSU income, and its only stated reason for doing so was that the unvested RSUs granted in 2015 through 2018 had been classified as marital property and equitably divided. We have two concerns with this reasoning.

First, it implies that when calculating child support, courts must make a binary choice between classifying something as marital property subject to equitable division and considering it as income for purposes of child support. Our precedent contains no such bright-line rule.[46] We have been careful to avoid a rigid definition of income for purposes of calculating child support, and instead have relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present.[47] We take this flexible approach because child support proceedings are equitable in nature.[48] As such, we reject the suggestion that the trial court had to make an all-or-nothing choice when it came to including RSU income in the child support calculation.

Moreover, the fact that a finite number of Steve's unvested RSUs were classified as marital and divided in the decree does not adequately explain why the court excluded *all* RSU income when determining total income for purposes of calculating

---

[45] See *id.*

[46] See, e.g., *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000) (finding no abuse of discretion in decree that treated growing and stored crops as divisible marital asset and also as income for purposes of child support); *Venter v. Venter*, 249 Neb. 712, 545 N.W.2d 431 (1996) (rejecting argument that it was error to treat husband's accounts receivable as marital property subject to division and as income for purposes of child support).

[47] See *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017).

[48] *Id.*

child support.[49] In addition to the marital RSUs, Steve has unvested RSUs granted in 2019 that were deemed nonmarital and set off exclusively to him, and it is reasonable to infer from the evidence that he will continue to accumulate significant grants of RSUs annually in the future. As those nonmarital RSUs accumulate and vest into shares, Steve will receive significant taxable income that is not subject to the decree's property division provisions, yet was not considered by the court when calculating child support. We note the decree states that when the nonmarital RSUs "begin to vest," the income should be considered for purposes of calculating child support. The first 20 percent of nonmarital RSUs was scheduled to vest just a few weeks after the decree was entered, yet the court excluded all RSU income when calculating Steve's total monthly income.

It is true that under the decree, Joy will receive a portion of Steve's annual RSU income until the last of the marital RSUs vest into shares—likely sometime in 2023, assuming no accelerated vesting applies. This may support a downward deviation in child support during that time period, but it does not justify a blanket exclusion of all RSU income when calculating child support.

In sum, on this record, we see no principled reason to exclude all RSU income from the child support calculation. We recognize Steve's annual RSU income fluctuated somewhat, but his average annual income from RSUs was well over

---

[49] See, e.g., *Hoegen v. Hoegen*, 89 Mass. App. 6, 43 N.E.3d 718 (2016) (finding father's income from vested RSUs should have been included along with his base salary and bonus compensation when calculating his child support obligation, because father regularly received RSUs as part of compensation package and regularly earned income from vested RSUs); *Heckman v. Heckman*, 422 S.W.3d 336 (Mo. App. 2013) (finding no error in using 3-year average of father's actual earnings from restricted stocks when calculating his income for purposes of child support, where restricted stocks were regularly granted as part of father's annual compensation package).

$357,000, and to categorically exclude all RSU income from the child support calculation was an abuse of discretion. We therefore reverse the child support provisions in the decree and remand the matter to the district court with directions to recalculate child support, on the existing record, without excluding all RSU income. We necessarily leave to the trial court's discretion the specific amount of RSU income to include when determining total monthly income for purposes of child support, and we express no opinion on the amount or duration of any downward deviation.

Because we are remanding for a recalculation of child support, we do not reach Steve's assignments of error on this issue.

### 3. Alimony

On appeal, Steve argues that the amount and duration of the alimony award was excessive, and on cross-appeal, Joy argues the amount of alimony was insufficient. She also argues the court should have required Steve to maintain life insurance to secure his future alimony obligation.

The Guidelines "intend that spousal support be determined from income available to the parties after child support has been established."[50] Because we are remanding this matter for recalculation of child support, it is appropriate to likewise reverse the alimony award and remand the matter with directions to determine alimony after Steve's child support obligations have been recalculated.[51] As such, we do not address the parties' assignments of error pertaining to the amount or duration of alimony.[52]

[15] We do, however, address Joy's argument that the court erred by failing to require Steve to maintain a life insurance

---

[50] Neb. Ct. R. § 4-213. See, also, *Hotz, supra* note 40 (for purposes of determining alimony, relative economic circumstances of parties are to be tested based on income available after child support obligations, if any, have been accounted for).

[51] See *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

[52] See *id.*

policy as security for his alimony obligation. Neb. Rev. Stat. § 42-365 (Reissue 2016) addresses alimony and provides that "[r]easonable security for payment may be required by the court." We have long construed this statute to give courts discretion, "in an appropriate case, to require sufficient security to be given for the payment of alimony . . . awards."[53] We have also said that "reasonable security for payment of alimony . . . should be invoked in the original decree only when compelling circumstances require it."[54]

Joy argues the decree should have included a requirement that Steve maintain a life insurance policy sufficient to secure his future alimony obligation. But she adduced no evidence of what such a policy would cost annually to maintain, and she directs us to no evidence of compelling circumstances that would warrant requiring security. On this record, we find no abuse of discretion in not requiring Steve to maintain life insurance as security for his alimony obligation.

### 4. Equal Parenting Time

[16] Lastly, Joy asserts on cross-appeal that the court erred in awarding Steve equal parenting time. Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.[55]

Our de novo review shows no abuse of discretion in awarding equal parenting time. The record fully supports the court's finding that both Steve and Joy are fit and proper parents and that the equal parenting time schedule imposed by the court is in the best interests of the children.

---

[53] *Lacey v. Lacey*, 215 Neb. 162, 164, 337 N.W.2d 740, 741 (1983).

[54] *Wheeler v. Wheeler*, 193 Neb. 615, 617, 228 N.W.2d 594, 596 (1975). Accord *Lacey, supra* note 53.

[55] See *Dooling, supra* note 8.

## V. CONCLUSION

For the foregoing reasons, we reverse the decree only as it pertains to the calculation of child support and alimony and remand the matter for recalculation on the existing record, in accordance with the Guidelines and this opinion. We affirm the decree in all other respects.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.