IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

PATTERSON V. PATTERSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KAMI D. PATTERSON, APPELLANT,

V.

FRANK D. PATTERSON II, APPELLEE.

Filed November 30, 2021.    No. A-21-056.

Appeal from the District Court for Cherry County: KARIN L. NOAKES, Judge. Affirmed in part, and in part reversed and remanded with directions.

James C. Bocott, of Law Office of James C. Bocott, P.C., L.L.O., for appellant.

Loralea L. Frank, of Bruner, Frank, Schumacher & Husak, L.L.C., for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Kami D. Patterson appeals the decree entered by the Cherry County District Court dissolving her marriage to Frank D. Patterson II. She claims the district court erred in its calculation of Frank's income for purposes of child support and alimony and in its valuation of gold and silver in the marital estate. We agree there was error in calculating Frank's income. And since child support must be recalculated due to the income error, we also reverse the alimony award so that it can be determined after the recalculation of child support. We find no error in the balance of the divorce decree. Accordingly, we affirm in part, and in part reverse and remand with directions.

- 1 -

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Kami and Frank were married in November 2002, and five children were born during the marriage between 2004 and 2013. The parties lived together in Idaho and married while Frank was in his second year of university. After Frank received his bachelor's degree, he enrolled in dental school in "the fall of 2007," and the parties continued to reside in Idaho through Frank's first year. Kami and Frank moved to Omaha, Nebraska, after the end of Frank's first year of dental school, and they lived in Omaha until Frank finished dental school in the "[s]pring of 2011." Beginning with the birth of their first child in 2004, Kami stayed home with the children "full-time" while Frank continued his education and worked to support the family.

After Frank completed dental school in 2011, the parties moved with their children to Valentine, Nebraska. The move to Valentine was "[f]or [Frank's] job," and Kami testified that "there was a dental practice in Valentine . . . where [Frank] wanted to start doing his practice." Over the course of several years, Frank's dental practice expanded as he formed a business partnership with other dentists from Nebraska and South Dakota to operate multiple shared practices. His work for these shared practices required him to frequently travel back and forth between Valentine and other communities in Nebraska and South Dakota. In addition to Frank's dental practice, the parties acquired several real estate interests for investment purposes, and Frank bought, sold, and traded gold and silver throughout the duration of the marriage. Frank was also involved for a time in other business ventures, such as a cattle business with Kami's brother.

### 2. TRIAL AND DECREE

Kami filed a complaint for dissolution on April 17, 2019, and trial was held on November 23 and 24, 2020. Prior to trial, the parties agreed to a parenting plan in which Kami and Frank would share joint legal and physical custody of the minor children. The remaining issues to be addressed were the determinations of child support and alimony as well as the valuation and division of the marital estate. As relevant to the issues on appeal, the parties offered evidence regarding Frank's income and the property in the marital estate. This evidence included the parties' joint tax returns for 2016, 2017, and 2018; a projection of Frank's average monthly income for 2020; and several documents concerning the value of gold and silver acquired by Frank over the course of the marriage. We will discuss this evidence in further detail in our analysis below.

The district court entered a decree dissolving the parties' marriage on December 22, 2020. The decree incorporated the parties' parenting plan and granted Kami and Frank joint legal and physical custody of the children. The court found that Frank had "suffered substantial fluctuations of annual earnings during the past three years," noting that his dental practice "endured a shut down due to the pandemic" and that Frank had "dissolved his partnership" with the other dentists as of December 2019. Due to these circumstances, the court calculated Frank's average monthly income to be $22,926, based on his "projected income for 2020" and "his adjusted gross income" from 2017 and 2018. Regarding Kami's income, the court found that she was "capable of working full time" and imputed an average monthly income of $1,560 to her. Based on these amounts, the decree ordered Frank to pay Kami $2,170 per month in child support for the five children. The decree also required Frank to pay Kami $3,500 per month in alimony for 78 months. Both

obligations were set to commence on January 1, 2021. After dividing the marital estate, the decree ordered Frank to pay Kami an equalization payment of $198,395. Frank was awarded the marital gold and silver at issue in this appeal; its value was determined to be $39,000.

### 3. POST-DECREE FILINGS AND APPEAL

After the entry of the decree, Frank filed a "Motion to Amend or Alter Judgment Pursuant to Neb. Rev. Stat. § 25-2001" on January 20, 2021, alleging that Kami caused damage to the marital home awarded to Frank in the decree and requesting the equalization payment be reduced "by the amount necessary to repair the marital home to its prior condition." After Kami filed a notice of appeal on January 21, the district court entered an order on March 2 in which it ordered the hearing on Frank's motion to be "continued pending appeal."

## III. ASSIGNMENTS OF ERROR

Kami claims the district court abused its discretion in using a projection of Frank's 2020 income as part of its calculation of Frank's average monthly income, and that this calculation yielded inaccurate and inequitable child support and alimony calculations. She also claims the district court abused its discretion in determining the value of the gold and silver in the marital estate to be $39,000.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

## V. ANALYSIS

### 1. JURISDICTION

It is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021). We therefore initially address this court's jurisdiction in light of Frank's "Motion to Amend or Alter Judgment Pursuant to Neb. Rev. Stat. § 25-2001" filed on January 20, 2021, for which no dispositional order was entered prior to the filing of the present appeal on January 21.

Neb. Rev. Stat. § 25-1912(3) (Cum. Supp. 2020) provides that the appeal time shall be terminated "by a timely motion to alter or amend a judgment" under Neb. Rev. Stat. § 25-1329 (Reissue 2016). However, such a motion would have to be filed no later than 10 days after the entry of a judgment. See *id.* In the present matter, Frank's motion to "amend or alter judgment"

was filed on January 20, 2021; it was clearly filed more than 10 days after the entry of the December 22, 2020, decree. However, Frank's motion to "amend or alter judgment" was not filed pursuant to § 25-1329; rather, it was filed pursuant to Neb. Rev. Stat. § 25-2001 (Reissue 2016), which provides for the district court's power to vacate or modify its judgments or orders during its term or upon a motion filed within 6 months after entry of a judgment. Accordingly, there is no pending motion terminating the appeal time for the December 22 decree and the absence of a district court order disposing of Frank's post-decree motion does not impact this court's jurisdiction over the present appeal.

## 2. CALCULATION OF FRANK'S INCOME AND CHILD SUPPORT

Kami claims the district court's calculation of Frank's average monthly income for child support purposes was an abuse of discretion. She contends that the court's use of a projection of Frank's 2020 income based on his dental clinic's net earnings from April through September of that year rendered an inaccurate calculation of Frank's monthly income, as this period represented "an anomalous and severely low six month income sample" that drove down Frank's income. Brief for appellant at 14.

The record indicates that the state of Frank's dental practice had changed substantially in the period leading up to the entry of the decree. Based on trial testimony and several exhibits, Frank's business partnership had dissolved in December 2019. Pursuant to agreements with his former business partners, Frank received 100 percent ownership of the Valentine dental clinic and three other limited liability companies related to the clinic's operation. His interests in the partnership's other dental clinics and business entities were thereafter transferred to his former business partners, and he no longer practices dentistry through those clinics. Frank also testified that the Valentine clinic closed for a period of time beginning in March 2020 due to the COVID-19 pandemic. During this shutdown period, Frank "personally" received approximately $12,000 from the "Payroll Protection Plan" "for the six weeks that we were not able to work." He further described that he was the only dentist at the Valentine clinic at the time of trial, and the last dental hygienist employed by the clinic had left "[p]rior to COVID."

The parties' joint tax returns reported adjusted gross incomes of $649,715 in 2016, $391,389 in 2017, and $306,950 in 2018. The parties' accountant testified that the 2019 joint tax return was not complete at the time of trial, and no materials regarding the parties' 2019 income were offered at trial.

In addition to the joint tax returns, Frank offered exhibit 28, a letter prepared by the parties' accountant estimating Frank's projected monthly income for 2020. According to exhibit 28, Frank earned $187,019.48 in "Gross Income" during the second quarter of 2020 (April through June) and $296,867.67 during the third quarter (July through September). After reducing these amounts by business expenses incurred in the operation of the clinic ($183,121.48 in second quarter; $173,755.44 in third quarter), his "Net Income" was $3,898 for the second quarter and $123,112.23 (hereafter rounded to $123,112) for the third quarter. Combining these totals, exhibit 28 indicated that Frank earned $127,010 over the course of these two quarters. By dividing that "Net Income" by the 6 months it represented, exhibit 28 estimated Frank's "Net income per month" to be $21,168 without factoring in federal and state taxes.

In its decree, the district court described that "[t]here is no doubt [Frank] suffered substantial fluctuations of annual earnings during the past three years," noting the Valentine clinic's shutdown in March 2020 and the end of Frank's business partnership. The court found that it was "reasonable to use income averaging" to calculate Frank's monthly income based on these fluctuations. In calculating Frank's income for child support, the court explained:

> Complicating this calculation is the fact that the parties' 2019 taxes are not complete and 2019 income information was not provided. Therefore, the Court will average [Frank's] projected income for 2020 ($127,010), and his adjusted gross income from 2017 ($391,389) and 2018 ($306,950) to determine his average monthly income.

According to the child support worksheet attached to the decree, the court determined Frank's monthly gross taxable income to be $22,926. This amount is consistent with the method set forth above: $127,010 in 2020 + $391,389 in 2017 + $306,950 in 2018 = $825,349 ÷ 3 years = $275,116 per year average ÷ 12 months = $22,926 per month.

We find that the district court abused its discretion in determining Frank's "projected income for 2020" to be $127,010 and in using that amount in the calculation of Frank's child support obligation. As we have described, exhibit 28 shows that over the period spanning April through September 2020, Frank's net earnings from the Valentine clinic totaled $127,010 for just those 6 months, not the entire year. Neither exhibit 28 nor any other evidence in the record indicates that Frank's projected income for the entire 2020 year was $127,010, and the court's determination of Frank's average monthly income for child support purposes was therefore not adequately supported by the evidence. We therefore find the district court's calculation of Frank's child support obligation to be in error.

Although we find that the district court erred in its calculation of Frank's monthly income and child support obligation by incorporating the $127,010 figure as an estimated annual income figure rather than just the 6 months it represented, we are not persuaded, as Kami urges on appeal, that the court's chosen methodology for calculating Frank's income was necessarily an abuse of discretion. We agree with the district court that the record in this case complicates the matter of calculating Frank's income for child support purposes. The evidence presented demonstrates that Frank's career and business position has substantially changed within the last few years. The dissolution of his business relationships at the end of 2019 may call into question the probative value of the parties' 2016, 2017, and 2018 tax returns, as the figures reported in those returns were based on Frank's ownership in and services rendered through several dental clinics. The absence of the parties' 2019 tax return and of any related materials that would evidence Frank's 2019 income further compounds the difficulties in computing Frank's income in this case.

Given these circumstances, exhibit 28, which evidences Frank's earnings over the second and third quarters of 2020, would seem to be the most contemporary evidence of Frank's income in light of the dissolution of his business partnership in December 2019. However, while exhibit 28 accounts for the second and third quarters of 2020, it omits the first quarter (January through March), a period for which Frank's earnings from the Valentine clinic would have been known and available to be included as part of the exhibit. The absence of financial information for that quarter is puzzling. Per Frank's testimony that he was closed for a period of time beginning in the middle of March 2020, this first quarter would have included approximately 2 weeks in which the

Valentine clinic was closed but would have otherwise provided a reliable indication of earnings after the partnership dissolution at the end of 2019 and before the downturn triggered by the COVID-19 pandemic.

The evidence reflects that the disparity between the $3,898 net income earned in the second quarter and the $123,112 net income earned in the third quarter was primarily attributable to the COVID-19 pandemic and the closure of the Valentine clinic during the second quarter. Despite the minimal net income earned during the second quarter, business at the Valentine clinic picked back up again in the third quarter. This quick turnaround indicates that the reduced level of income earned during the second quarter of 2020 is not likely to be repeated.

In contrast to the second quarter, the record suggests that the Valentine clinic remained open during the entire third quarter, as Frank did not testify to any other closures of the Valentine clinic. In light of the clinic's operation appearing to return to a more regular state of affairs, Frank's earnings in the third quarter are more representative of his typical quarterly income in comparison to his earnings in the second quarter. Those most recent 3 months of earnings best represent Frank's current earning capacity and nothing in the record suggests that level of earnings would not be maintained going forward. And when determining income for child support purposes, it is certainly reasonable to consider financial circumstances which have lasted 3 months and can reasonably be expected to last for an additional 6 months. See, for example, Neb. Ct. R. § 4-217 (when modifying child support under the Nebraska Child Support Guidelines, it is a rebuttable presumption of a material change of circumstances when financial circumstances have lasted 3 months and can reasonably be expected to last for an additional 6 months and would result in a variation of 10 percent or more upward or downward in a child support obligation). Based on the record before us, Frank's third quarter income in 2020 could reasonably be expected to last for an additional 6 months. Therefore, Frank's third quarter net income of $123,112 could be extrapolated to the first and fourth quarters of 2020, which are not accounted for, to provide an annual net income of $373,234, or $31,103 per month. Alternatively, the third quarter net income of $123,112 could be extrapolated over an entire year, resulting in an estimated annual net income of $492,448, or $41,037 per month. This higher amount would reflect an earning capacity for a full year of more typical earnings since it would disregard the low earnings of the 2020 second quarter, which was attributed to the COVID-19 pandemic and is unlikely to be repeated.

Another alternative would be to use the methodology employed by the district court, but with a 2020 income or earning capacity representative of a full 12 months. Using the district court's methodology would mean averaging the 2017 and 2018 adjusted gross incomes with an estimated 2020 annual net income or earning capacity of either $373,234 or $492,448, as calculated in the preceding paragraph. Using $373,234 for 2020 results in a 3-year total income of $1,071,573, which divided by 3 years equals $357,191 per year or $29,766 per month. Using $492,448 for 2020 results in a 3-year total income of $1,190,787, which divided by 3 years equals $396,929 per year or $33,077 per month.

In summary, we conclude the district court erred in determining Frank's projected annual income for 2020 to be $127,010 and in using this figure to calculate Frank's average income for child support purposes. We therefore reverse the district court's calculation of child support and remand this issue to the district court with directions to redetermine Frank's income and recalculate his child support obligation. While we have set forth several alternatives on how that might be

done on the present record, we leave to the district court's discretion which method it determines most appropriate to calculate Frank's monthly income for purposes of child support.

## 3. ALIMONY

Although Kami argues that the district court's award of $3,500 in alimony should be increased, we need not address her argument in this appeal. The Nebraska Child Support Guidelines "intend that spousal support be determined from income available to the parties after child support has been established." Neb. Ct. R. § 4-213. See, also, *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018) (for purposes of alimony, relative economic circumstances of parties are to be tested based on income available after child support obligations have been accounted for). Accordingly, because we are remanding this matter to the district court for the determination of Frank's average income or earning capacity and recalculation of child support, we also reverse the district court's alimony award and remand the issue with directions to determine alimony after the recalculation of child support. See *Vanderveer v. Vanderveer*, 310 Neb. 196, 964 N.W.2d 694 (2021) (since matter was remanded for recalculation of child support, it was appropriate to likewise reverse alimony award and remand with directions to determine alimony after child support obligation is recalculated).

## 4. VALUE OF GOLD AND SILVER IN MARITAL ESTATE

### (a) Acceptance of Benefits Rule

Before we address Kami's claim that the district court erred in valuing the marital gold and silver at $39,000, we note that Frank claims in his brief that Kami "waived her right to prosecute an appeal as to the final award amount of the property settlement" because she has accepted the benefits of the decree's division of marital property. Brief for appellee at 24.

Frank directs our attention to events occurring after Kami filed the notice of appeal in this case on January 21, 2021. We note that four supplemental transcripts were filed in this appeal. The second supplemental transcript contains a "Praecipe for Execution" filed on May 28 in which Kami alleged that $169,754.09 remained due from the equalization payment ordered by the decree and requested the clerk of the district court to issue an execution to direct the collection of the remaining judgment. That same day, the clerk issued the requested execution. Frank filed an objection to the execution on June 15 and requested that the court deny Kami's request and issue a stay of execution due to his "pending motion to alter or amend" the decree, Kami's appeal from the decree, and the parties' federal tax liability that could impact the equalization payment pursuant to an agreement between Kami and Frank. Frank also alleged that he paid $30,310.25 of the total equalization payment to Kami on March 30. In an order entered on June 18, the court denied Frank's objection for lack of jurisdiction.

Under the general acceptance of benefits rule, an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant. See *Liming v. Liming*, 272 Neb. 534, 723 N.W.2d 89 (2006). However, Nebraska case law provides for several exceptions to the general rule. See *id*. An exception to the acceptance of benefits rule exists where the right to the benefit accepted is absolute and cannot possibly be affected by reversal of the judgment. *Id*. It is the possibility that an appeal may lead to a result showing that the party was not entitled to what was

received under the judgment appealed from that defeats the right of appeal. See *id*. Where there is no such possibility, the right to appeal is unimpaired by the acceptance of benefits under the judgment appealed from. *Id*.

Thus, the acceptance of benefits rule has no application where one is shown to be so absolutely entitled to the sum collected or accepted that reversal of the judgment or decree will not affect his or her right to it, as in the case of a collection of an admitted or uncontroverted part of his or her demand. *Id*. The rule does not apply when the appellant is conceded to be entitled to the thing he or she has accepted and where the appeal relates only to an additional claim on his or her part. *Id*. Acceptance of part of an award is not inconsistent with an appellant's claim that the award should have been larger. See *id*. There must be unusual circumstances, demonstrating prejudice to the appellee, or a very clear intent to accept the judgment and waive the right to appeal, to keep an appellate court from reaching the merits of the appeal. *Id*.

Neither Kami's acceptance of $30,310.25 paid by Frank, nor her filing of the "Praecipe for Execution" and the issued execution, preclude Kami's appeal as to the valuation of the marital gold and silver. Frank's payment of $30,310.25 demonstrates that he has conceded Kami's right to that amount. And to the extent that the "Praecipe for Execution" can be considered an acceptance of the remaining $169,754.09 owed under the decree, such acceptance is not inconsistent with Kami's position on appeal that the court erred in failing to assign a higher value to the gold and silver awarded to Frank. Notably, Frank has not cross-appealed the district court's determination of the property equalization amount. Kami's claim on appeal is that the property equalization payment awarded to her should have been larger based on an alleged improper valuation of the parties' gold and silver. Therefore, the relief Kami seeks on appeal could only increase the amount awarded to her under the decree. The acceptance of benefits rule does not apply in this instance since Frank does not challenge the property equalization amount ordered, and Kami's appeal relates only to an additional claim on her part. See *Liming v. Liming, supra*. We now address Kami's claim that the district court erred in its valuation of the gold and silver.

(b) Value of Marital Gold and Silver

At trial, the parties offered evidence concerning the gold and silver acquired over the course of the marriage. Although she could not recall the value or amount, Kami recalled Frank having shown her gold and silver kept in a safe in the marital home. Frank testified that the last time he had "any gold of value" in his possession was "[o]ver two years ago," and the only gold in his possession was in the form of "gold teeth" that were part of the dental clinic and worth approximately "[$]20 or $30 a crown." Concerning the silver in the marital estate, Frank testified that this silver was worth $25,000. He described that he had "[s]old," "bought," and "traded" silver over the course of the marriage, and he did not keep track of his purchases and sales of silver. Frank additionally estimated that he had sold less than $4,000 worth of silver since January 1, 2019, up through the time of trial. Exhibit 68, a collection of receipts from one vendor offered by Kami and obtained via subpoena, indicates that Frank had purchased $157,806.18 in silver from that vendor "from March of 2013 through June of 2019."

Three documents listing the value of various assets were received at trial. A personal financial statement signed by Frank and dated March 9, 2017, represented that the parties' "Gold/Silver" was worth $110,000. In a subsequent financial statement also signed by Frank and

dated March 22, 2018, the value of the parties' "Gold/Silver" was reported to be $150,000. A "Statement of Personal Net Worth" dated August 2, 2019, was not signed, but Frank's testimony indicated it was prepared with his input; it valued the "Gold & Silver" at $35,000. Frank denied ever having possessed $150,000 in silver, although he acknowledged that he had "bought that much" over the course of his trading. Regarding the $150,000 claimed in the 2018 financial statement, he testified that he "made a mistake on [the] bank document" and "there might have been some miscommunication [with the person who filled out the document] as to how much silver [he] had on-hand."

The district court determined that the August 2019 statement, which valued the marital gold and silver at $35,000, was "the most credible evidence of what remained of the silver at that time." The court also noted that Frank "admitted he sold approximately $4,000 [in silver] between January 2019 and April 2020," and this $4,000 "should be included in the value as there was no evidence the proceeds were used for a marital purpose." The court thereafter found the "marital value of the silver to be $39,000."

On appeal, Kami directs our attention to the conflicting financial statements and the sharp decrease in the reported value of the silver from $150,000 in 2018 to $35,000 in 2019. She also highlights that the silver at issue in this case was under Frank's exclusive control and further asserts that the record indicates that Frank "sold or disposed of $120,000 in marital assets and had no record of his expenditures." Brief for appellant at 19.

While we note the disparate values of the marital gold and silver reported in the 2017, 2018, and 2019 documents, we cannot say the record affirmatively shows that Frank dissipated the gold and silver in the marital estate. Rather, we find the record indicates a conflict in the evidence regarding the value of such gold and silver. There is no dispute that Frank bought, sold, and traded silver throughout the marriage. Further, the district court was presented with the conflicting valuations and Frank's explanation that the $150,000 valuation of the marital gold and silver reported in the 2018 financial statement was the result of a possible "miscommunication" and "mistake." Based on the decree, it is evident the court found Frank's testimony and the 2019 valuation to have been credible. When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). Giving weight to the trial judge who heard and observed the witnesses on this matter, we cannot say there was an abuse of discretion in determining the value of the marital gold and silver to be $39,000.

## VI. CONCLUSION

For the reasons set forth above, we reverse the district court's determination of Frank's income and the resulting calculation of child support. We also reverse the alimony award. We remand these matters back to the district court with directions to (1) determine Frank's income as provided in this opinion, (2) recalculate Frank's child support, and (3) determine an appropriate alimony award based upon Frank's newly determined income and recalculated child support obligation. We affirm the remainder of the decree.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.